Greystone Granite Quarries, Inc. v. Commissioner.
Greystone Granite Quarries, Inc. v. Commissioner
Docket No. 80333.
United States Tax Court
T.C. Memo 1961-16; 1961 Tax Ct. Memo LEXIS 332; 20 T.C.M. (CCH) 66; T.C.M. (RIA) 61016; January 26, 1961
*332 Robert G. Kittrell, Jr., Esq., Law Bldg., Henderson, N.C., Thomas N. Carruthers, Jr., Esq., and William H. Westphal, C.P.A., for the petitioner. Richard C. Forman, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: Respondent determined a deficiency in the petitioner's income tax for the taxable year ended February 29, 1956, in the amount of $12,732.04. The only issue presented is whether income received from royalties by petitioner and paid to its shareholders constituted taxable income of petitioner. Findings of Fact Some facts have been stipulated and are incorporated herein by reference. Greystone Granite Quarries, Inc., hereinafter referred to as the petitioner, is a North Carolina corporation with its principal office at Henderson, North Carolina. It was incorporated in 1948; its principal business is the quarrying of granite. The petitioner filed its Federal income tax return for the fiscal year ending February 29, 1956, on an accrual method of accounting with the director of internal revenue for North Carolina. During the period at issue the stock of the petitioner was held one-third by C. H. Wolfe, one-third *333 by H. D. Hedrick and one-third by the heirs of M. N. Hedrick. Wolfe, H. D. Hedrick and M. N. Hedrick were the original incorporators of the petitioner. William E. Johnson, an engineer and inventor, made certain new and useful improvements in pneumatic drilling equipment and applied for a patent thereon on July 7, 1950. The basic idea for such a drill had been conceived by G. S. Rodgers who suggested it to Johnson. In May 1951, Johnson contacted Wolfe, the president, and H. D. Hedrick, the secretary of the petitioner, whom he had known for about 12 years. His purpose was to secure the necessary financial backing and equipment to build a workable model of the drilling machine. As a result of this meeting Johnson became an employee of the petitioner and utilized its facilities in developing the drilling machine. This all occurred before August 17, 1951. On August 17, 1951, two documents were executed in reference to the drilling machine. The first was a contract between petitioner, Johnson and Rodgers which recited that Johnson would continue his work on the machine; petitioner would pay all costs and expenses of development; Johnson would assign his patent application to petitioner; *334 after the patent was issued and a model built, petitioner would transfer the patent to a contemplated new corporation, the stock of which would be issued 49 per cent to Johnson and 51 per cent to petitioner or its representatives and that Rodgers would receive 10 per cent of any royalties from the construction of the machine by other parties after petitioner had been reimbursed for all its expenses. The provision in respect to Rodgers was included because Johnson had agreed to pay Rodgers 10 per cent of gross royalties derived from the patent prior to any agreement with petitioner. The other document executed was an assignment by Johnson of all his "right, title and interest to and under the said Application for Letters Patent" to petitioner, the "same to be held and enjoyed by said assignee for its own use and behoof and of its successors, assigns and legal representatives * * * as the same would have been held by * * * [Johnson] had this assignment and sale not been made * * *." This assignment was recorded in the United States Patent Office on August 30, 1951. In executing this assignment Johnson did not intend to divest himself completely of all interest in the patent. His *335 intent was to assign away only 51 per cent of the patent while retaining 49 per cent. He felt his interests were protected by the collateral agreement. At a shareholders' meeting of the petitioner on March 20, 1952, it was stated by Wolfe who conducted the meeting that: "Mr. W. E. Johnson's drill, which we took over in May, 1951, as trustee, is in use here and is proving to be a real success. We hope to work out a satisfactory arrangement for marketing this drill in 1952." A contract was entered into on October 6, 1952 between petitioner, "as Trustee," party of the first part; Wolfe, H. D. Hedrick, Johnson and the heirs of M. N. Hedrick, parties of the second part; and The Travel Drill Company, hereinafter referred to as Travel Drill, party of the third part. It provided that petitioner, who was referred to as "holder of the legal title," would sell all its rights in the patent to Travel Drill; that Travel Drill would manufacture and sell the drills; and that petitioner would receive one-third of the profits from sales. This contract was executed on November 10, 1952. An agreement between petitioner, Wolfe, H. D. Hedrick, Johnson and the heirs of M. N. Hedrick executed on November 10, 1952, stated *336 that the petitioner would be reimbursed for its costs "out of first proceeds from the sale of said patent" and after reimbursing petitioner, Rodgers shall be paid 10 per cent of the net proceeds derived from the patent with the remaining 90 per cent of such net proceeds accounted for and distributed to the equitable owners as follows: William E. Johnson
49%
H. D. Hedrick
17%
C. H. Wolfe
17%
The heirs of M. N. Hedrick
17%
On November 10, 1952, Johnson, H. D. Hedrick, Wolfe and the heirs of M. N. Hedrick, designating themselves as the "equitable owners," entered into a separate agreement to "confirm and accept the obligation to pay [Rodgers] 10% of the royalties" from the proceeds from the patent. The equitable owners executed another agreement on November 10, 1952, which authorized the petitioner "to negotiate"a nd "to make such sale" of the patent "as may appear to be for the best interest of the equitable owners * * *." Wolfe, H. D. Hedrick and T. L. Hedrick, the petitioner's board of directors, held a special meeting on November 12, 1952, at which time a resolution was passed whereby petitioner agreed to act as trustee for the equitable owners of the *337 patent and the petitioner's directors were named "as a Trust Committee to supervise said trust." It was resolved at a meeting of the Trust Committee on December 15, 1952, that all funds would be deposited in the First National Bank of Henderson, North Carolina, and distributed as follows: (1) Retain 5% for services (2) Reimburse petitioner for its expenses (3) Pay Rodgers 10% (4) Distribute the remainder to the equitable owners with reference to the percentages previously agreed upon. At a meeting of the Trust Committee on January 3, 1956, it was reported that the patent had been sold to Travel Drill for $48,000 and the expenses of the petitioner were $38,000. The Trust Committee resolved that $38,000 be paid to petitioner as reimbursement of expenses; that $500 be paid to petitioner as trustee's commission; that the estate of Rodgers be paid $950; and that the remaining sum of $8,650 be distributed as follows: Johnson
$4,238.50
Wolfe
1,470.50
H. D. Hedrick
1,470.50
M. N. Hedrick
1,470.50
On January 4, 1956, an account was opened at the First National Bank, Henderson, North Carolina, in the name of "Greystone Granite Quarries, Inc., Trustee - Travel *338 Drill Co." with a deposit of $10,000. After various deposits and withdrawals, the balance in the account on January 30, 1957 was $6,224.31. The amounts expended by the petitioner in developing the drill were recorded in special books and a part was deducted by the petitioner on its tax returns during the development period. Neither Wolfe nor H. D. Hedrick advanced personal funds to pay development expenses. The petitioner reported the $38,000 it received as "reimbursement for its expenses" on its tax return for the fiscal year ended February 29, 1956, as an $11,442.94 capital gain. The attached schedule of explanation was as follows: Capital Gain: Greystone Quarry: Installment sale-drill
rig: Total sale
$38,000.00
100.00%
Cost
16,557.78
43.57%
Profit
$21,442.22
56,43%
Payment received 1955-
56
$20,278.11
% Profit to be reported
56.43
$11,442.94
Under an agreement dated January 31, 1959, petitioner resigned as trustee and Wolfe, H. D. Hedrick and T. L. Hedrick became "successor trustees." This agreement was prompted by the sale of petitioner's stock to the Vulcan Materials Company. Travel Drill breached the agreement of October 6, 1952 "by *339 its failure to furnish full and complete accounting for each quarter and in its failure to make the minimum payments provided for in the said agreement" and as a result on June 7, 1960, the patent was assigned by Travel Drill to the "successor trustees." Petitioner, during its fiscal year ended February 29, 1956, collected $29,078.05 in royalties from Travel Drill and paid out the following amounts: Rodgers
$ 2,907.81
Johnson
12,823.42
H. D. Hedrick
4,448.94
Wolfe
4,448.94
M. N. Hedrick
4,448.94
$29,078.05
Petitioner neither reported the royalties as income nor filed a tax return or information return reporting the distribution of any patent rights to its shareholders. The stockholders of petitioner have never filed any tax returns indicating the receipt of any patent rights from petitioner. The assignment by Johnson transferred 51 per cent of the beneficial interest in the patent to the petitioner. The petitioner has never distributed this interest to its stockholders. Of the amounts paid out by the petitioner during its fiscal year ended February 29, 1956, the aggregate amount of $13,346.82, which represents individual payments of $4,448.94 to *340 H. D. Hedrick, Wolfe and the heirs of M. N. Hedrick, constituted taxable income of petitioner. Opinion The respondent determined that the petitioner obtained a 51 per cent beneficial interest in a patent by assignment which it never relinquished by a transfer of any character and which it still held during the taxable year at issue. Accordingly, the respondent determined that the part of the royalty payments received from the patent by petitioner and distributed to its shareholders was taxable income of petitioner. The petitioner contends that it never had any beneficial or equitable interest in the patent and that the royalty payments were received by it as trustee for the beneficial owners. Petitioner asserts further, that even if we assume that it ever had a beneficial interest in the patent, this interest was distributed in an effective transfer in November 1952, and therefore the royalty payments received three years later may not be taxed to it. A careful analysis of the entire transaction is necessary to resolve whether the royalty payments constitute income to the petitioner inasmuch as the question is primarily factual. To substantiate its position that it did not *341 receive beneficial title in the assignment from Johnson, petitioner calls our attention to the fact that Johnson approached Wolfe and H. D. Hedrick as individuals and not in their corporate capacities; that petitioner was referred to as "trustee" on numerous occasions; that it has never been in the business of exploiting patents; and that an agreement executed at the time of the assignment clearly indicated that petitioner was to take as trustee. In examining the assignment of the patent applications from Johnson to petitioner and the collateral agreement between Rodgers, Wolfe and petitioner, we were unable to find anything in the writings which would indicate that a trust relationship was intended. The assignment stated that the patent was "to be held and enjoyed by [petitioner] for its own use and behoof and [that] of its successors, assigns and legal representatives * * * as the same would have been held by [Johnson] had * * * [the] assignment and sale not been made * * *." We construe this recitation to be that petitioner was to take both legal and beneficial title under the assignment, the same as was held by Johnson prior to the execution of the assignment. We do not *342 think that the arguments raised by the petitioner negate such a construction. We are cognizant of the law of North Carolina which permits a parol trust to be engrafted on an absolute transfer. ; . Petitioner has introduced testimony attempting to establish the existence of such a trust; however, the testimony for the most part was self-serving and we are of the opinion that it did not establish by "clear, cogent and convincing" evidence that such a parol trust did exist. ; . Cf. . The collateral agreement and the utilization of petitioner's facilities and funds to develop the patent are other indicators in addition to the assignment demonstrating that petitioner was intended to be the beneficial owner. The collateral agreement made no mention of any trust; rather it provided that a new corporation would be formed when the drill was finally completed. The stock of this new corporation was to be issued "49% to William E. *343 Johnson and 51% to Greystone Granite Quarries, Inc. or their representatives." From the quoted phrase petitioner draws the inference that the individuals and not petitioner were to become shareholders in the new corporation. Petitioner argues that this inference is supported by the testimony explaining the import of this provision. We are unable to accept this inference. As we view it, the agreement is clear on its face and we interpret the phrase to be that the petitioner was to become a 51 per cent stockholder in the new corporation. See Williston on Contracts (rev. ed.) § 640. The petitioner permitted its shop facilities to be utilized in constructing a model of the drill and it also paid the expenses of development. It deducted a part of these expenses during the period the patent was being developed. Although there was testimony that petitioner would have been indemnified by the "equitable owners" had a loss been incurred, we think it to be of little weight in the absence of further evidence manifesting such an intent. In view of our holding that the assignment passed a beneficial interest to the petitioner, we must consider the petitioner's alternative argument that this *344 interest was distributed in November 1952. In resolving this question we are again confronted with the "fruit" and "tree" arrangement. . The law is settled that the "fruits" cannot be attributed "to a different tree from that on which they grew." . See also and Cf. ; , affd. (C.A. 1, 1956). Here, we know who is receiving the "fruits" - the stockholders of the petitioner - and it is our task to ascertain to whom this fruit-bearing "tree" belongs. Petitioner, as evidence that the patent was distributed, points to the several documents executed in November 1952; the trust committee and the minutes of its meetings; the separate checking agreement; and the fact that Travel Drill insisted on the execution of the sales agreement by all the "individual owners." After giving due consideration to the arguments of the petitioner, we are not convinced that it ever *345 distributed the beneficial interest in the patent. Although there are many references to the petitioner as the holder of the "legal title" and "trustee" in the documents executed in November 1952 we find nothing to indicate that the patent was distributed at that time as claimed by the petitioner, or that the terms used were anything more than labels. The special director's meeting of the petitioner in November 1952, at which time it was resolved that petitioner would accept the trusteeship, and the subsequent meeting of the "trust committee" are meaningless without a more definite showing that the patent was distributed to the stockholders. The fact that Travel Drill insisted that the sales agreement be executed by all the "individual owners" as well as the petitioner adds little weight as such a demand would seem to be a logical precautionary measure in view of the confusion that existed concerning the title to the patient. When property is removed from the corporate shell and the alleged distributees of the property are also officers and directors of the distributing corporation and immediately following the distribution, the property is returned to the corporation to hold *346 as trustee with the same parties then comprising the "trust committee," the steps in such a transaction should be clear and distinct and should not, as here, be left to inferences and innuendos. In accord with our finding that the petitioner was still in possession of the "tree" during the taxable period at issue, we hold that the "fruits," the royalty payments, must be attributed to the tree from which they came. It follows that the respondent's determination is correct. Decision will be entered for the respondent.